IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

DR. YUL CHU                                                          PLAINTIFF

v.                                          CIVIL ACTION NO. 1:08-CV-00232-GHD-DAS

MISSISSIPPI STATE UNIVERSITY and
BOARD OF TRUSTEES, INSTITUTIONS OF HIGHER LEARNING          DEFENDANTS

## MEMORANDUM OPINION GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Presently before the Court is Defendants' motion for summary judgment [111] on Plaintiff's Title VII claim. Upon due consideration, the Court finds Defendants' motion for summary judgment is well taken and should be granted.

### A. Factual and Procedural Background

In August of 2001, Mississippi State University ("MSU") and the Board of Trustees of State Institutions of Higher Learning (the "Board") hired Plaintiff Dr. Yul Chu ("Plaintiff"), a native of Korea, as a tenure-track, assistant professor in its Department of Electrical and Computer Engineering. In this capacity, Plaintiff worked under a series of one-year employment contracts. In the fall of 2006, in Plaintiff's sixth year of employment at MSU, he applied for tenure and promotion to the position of associate professor.

Before a tenure-track faculty member may apply for tenure at MSU, he or she must complete a five-to-six-year probationary period and satisfy certain academic requirements, which are listed in the Faculty Handbook. During the faculty member's probationary period, he or she undergoes annual reviews. When the faculty member is eligible to apply for tenure, he or she submits a tenure and promotion application with supporting documents for review.

When evaluating a candidate for tenure, reviewers at MSU consider three categories of performance—teaching, research or creative activity (depending on the discipline), and service. Additionally, reviewers consider whether the applicant is excelling in at least one of the three areas of performance.[1]  To receive tenure, the applicant must demonstrate satisfactory performance in teaching, research, and service, and excellence in at least one area.

The tenure process at MSU is multi-tiered, and reviews at every level are considered in the final decision.  *See* MSU Policies & Procedures [111-1] at 9–13; Promotion & Tenure Policies & Procedures [111-3] at 6–15.[2]  First, elected, tenured faculty members in the tenure applicant's own department sit as a committee to review[3] the application and make a recommendation.  Second, the department head conducts a review of the application and then makes a recommendation, followed by the college tenure and promotion committee's review and recommendation, and the college dean's review and recommendation.  Next, the provost of MSU reviews all the evaluations and makes a recommendation to the president of MSU, who ultimately decides whether to recommend the candidate to the Board for tenure.  If the president recommends tenure, the matter is forwarded to the Board for approval.  If the president does not recommend tenure, the candidate may appeal the denial by submitting a request to the provost.

If the candidate appeals the decision, the University Committee on Promotion and Tenure conducts hearings and interviews with the tenure applicant and the parties involved in the tenure

---

[1] "Attainment of tenure at [MSU] is by no means automatic, based on years of service, but is the result of a thorough evaluation of a faculty member's performance in teaching, research and/or creative achievement, and service.  The proportions of these activities will vary by discipline.  Excellence in one area and satisfactory performance in the others are needed to qualify a faculty member for tenure."  MSU Policies & Procedures [111-1] § 4.5.

[2] The tenure review process detailed in this opinion was the one in place at MSU at the time Plaintiff applied for tenure.

[3] Part of the review process at this tier entails soliciting recommendations from external reviewers in the applicant's field of study.

review process and then forwards its recommendation to the provost. The provost subsequently forwards the committee's recommendation and his own second recommendation to the president for action. The president acts upon the appeal. If the president recommends tenure, the matter is forwarded to the Board for approval of the grant of tenure. If the president declines to recommend tenure, the appeal is final, absent the applicant's appeal to the Board. Each level of review is independent of the others, and no reviewer is bound by the others' recommendations. Upon a final decision to deny tenure to an applicant, MSU provides the unsuccessful applicant with a terminal, one-year employment contract, after which his employment contract will not be renewed.

In the case *sub judice*, after Plaintiff filed his application for tenure and promotion, the Department of Electrical and Computer Engineering Promotion and Tenure Committee reviewed his request and voted against recommending him for tenure and promotion. *See* Dep't Recommendation [111-6]. Thereafter, the head of the department, the college committee, the dean, and the provost successively reviewed Plaintiff's application and similarly did not recommend him for tenure; thereafter, the president likewise did not recommend Plaintiff for tenure. *See* Recommendations [111-7–111-11].

Plaintiff sought administrative reconsideration of the decision to deny him tenure. His appeal was reviewed by the University Committee on Tenure and Review. Defendants contend that this committee also conducted an investigation into the matter, including interviews of Plaintiff and others involved in the tenure process, Defs.' MSJ [111] at 4, ¶ 19; Plaintiff argues "there was no investigation conducted," Pl.'s Mem. Br. Supp. Resp. to Defs.' MSJ [118] at 1. Defendants maintain that the University Committee on Tenure and Review found no evidence that Plaintiff's application for tenure and promotion had been denied because of his ethnicity,

national origin, or race or that the decision on his application was prejudiced, arbitrary, or capricious. Upon review, the university committee, the provost, and the president declined to recommend Plaintiff for tenure. MSU maintains that although Plaintiff had demonstrated satisfactory achievement in the areas of teaching and service, he had failed to demonstrate a research record sufficient for an award of tenure, particularly with respect to publishing and obtaining competitive research funding. Plaintiff argues that the decision to deny tenure was not based on Plaintiff's qualifications, but on his race and national origin.

Plaintiff subsequently appealed the decision to the Board. Defendants maintain that the Board reviewed Plaintiff's request and declined to hold a hearing on the matter. Plaintiff alleges that "[o]n or about May 2, 2007, Plaintiff was informed, words to the effect, that he was terminated from his employment at MSU." Pl.'s Compl. [1] ¶ 9. Subsequently, Plaintiff signed a one-year, nonrenewable contract for the 2007–2008 school year, and accepted employment as an assistant professor at the University of Texas – Pan American where he would earn a greater salary than he earned while employed at MSU. Pl.'s Dep. [111-37] at 12, 122.

Plaintiff filed an EEOC charge wherein he alleged that he was denied tenure for discriminatory reasons. *See* EEOC Charge [1] at 6–10. Upon receipt of his right-to-sue letter from the EEOC, *see* EEOC Right-to-Sue Letter [1] at 11, he filed this suit against MSU and the Board (collectively, "Defendants"),[4] claiming he was unlawfully denied tenure and discriminated against due to his race and national origin in violation of Title VII.[5] Plaintiff appears to base his Title VII claim on four main allegations: (1) that MSU failed to apply its anti-discrimination

---

[4] Plaintiff initially sued three additional Defendants, Dr. Robert H. "Doc" Fogelsong, Dr. D. E. Magee, Jr., and Dr. Thomas C. Meredith. At the time of the alleged events, Dr. Fogelsong was President of MSU, while Dr. Magee and Dr. Meredith served as trustee and commissioner of the Board, respectively. *See* Pl.'s Compl. [1] ¶¶ 4–5; Defs.' Answer [9] at 7, ¶ 2. After Defendants filed a motion to dismiss [44], the Court dismissed these three Defendants on immunity grounds. *See* Ct.'s Order [90] & Mem. Op. [91] Granting Defs.' Mot. Dismiss [44].

[5] Plaintiff also asserted a 42 U.S.C. § 1983 claim and state-law breach-of-contract claim, both of which were dismissed on immunity grounds. *See* Ct.'s Order [90] & Mem. Op. [91] Granting Defs.' Mot. Dismiss [44].

policies and procedures in reaching the tenure decision including conducting an investigation into Plaintiff's allegations of discrimination; (2) that a similarly situated Caucasian assistant professor, Dr. J. W. Bruce, was treated more favorably than Plaintiff; (3) that Plaintiff was not granted tenure even though his qualifications met or exceeded those of other tenure applicants who were granted tenure, particularly Dr. Bruce; and (4) that members of the department mocked Plaintiff's Korean accent.

On September 30, 2013, Defendants filed the present motion for summary judgment [111] on the Title VII claim. Plaintiff filed a response, and Defendants filed a reply. The matter is now ripe for review.

### B. Legal Standards

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). *See* FED. R. CIV. P. 56(a); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S. Ct. 2548.

The party moving for summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine dispute of material fact. *Id.* at 323, 106 S. Ct. 2548. Under Rule 56(a), the burden then shifts to the nonmovant to "go beyond the pleadings and by . .

5

. affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S. Ct. 2548 (internal quotation marks omitted). *Accord Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001); *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995).

Where, as here, the parties dispute the facts, the Court must view the facts and draw reasonable inferences in the light most favorable to the nonmovant. *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal citations omitted). "However, a nonmovant may not overcome the summary judgment standard with conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McClure v. Boles*, 490 F. App'x 666, 667 (5th Cir. 2012) (per curiam) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007)).

Plaintiff claims Defendants wrongfully denied him tenure due to his race and national origin in violation of Title VII. The Fifth Circuit has noted:

> Other circuits have recognized that tenure decisions in colleges and universities involve considerations that set them apart from other kinds of employment decisions. Those factors are: (1) tenure contracts require unusual commitments as to time and collegial relationships, (2) academic tenure decisions are often non-competitive, (3) tenure decisions are usually highly decentralized, (4) the number of factors considered in tenure decisions is quite extensive, and (5) tenure decisions are a source of unusually great disagreement.

*Tanik v. So. Methodist Univ.*, 116 F.3d 775, 776 (5th Cir. 1997) (internal footnotes omitted) (citing *Zahorik v. Cornell Univ.*, 729 F.2d 85, 92–93 (2d Cir. 1984); *Kumar v. Univ. of Mass.*, 774 F.2d 1, 11 (1st Cir. 1985)). Although tenure decisions may be unique employment decisions, they do not exempt an employer from judicial scrutiny under Title VII. *Id.*

6

Under Title VII, it is unlawful "for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Intentional discrimination can be proven by either direct or circumstantial evidence. *Crawford v. U.S. Dep't of Homeland Sec.*, 245 F. App'x 369, 378 (5th Cir. 2007) (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000)). Direct evidence "must, if believed, prove the fact in question without inference or presumption." *Id.* (citing *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003) (citations omitted)).

When there is no direct evidence of unlawful discrimination, this Court is bound to follow the *McDonnell Douglas* framework to determine whether the plaintiff has a Title VII discrimination claim. *See Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). Under the *McDonnell Douglas* framework:

> the plaintiff must first demonstrate a prima facie case of discrimination; the defendant then must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff; and, if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine [dispute] of material fact that either (1) the employer's reason is a pretext or (2) that the employer's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic[.]

*Burrell v. Dr Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411–12 (5th Cir. 2007) (internal quotation marks omitted); *see Rachid*, 376 F.3d at 312 (citing *McDonnell Douglas*, 411 U.S. 792, 93 S. Ct. 1817). Even in *McDonnell Douglas*'s burden-shifting framework, the ultimate burden remains with the plaintiff. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).

### C. Analysis and Discussion

Plaintiff alleges that MSU unlawfully denied him tenure based on his race and national origin and argues in support that a comment made to another faculty member and a gesture made to him by faculty members and his department head amounts to direct evidence of discrimination, or alternatively, that he has presented sufficient indirect evidence of discrimination to satisfy the *McDonnell Douglas* framework.

#### 1. Direct Evidence

First, Plaintiff argues that he has presented direct evidence of discrimination. In this respect, Plaintiff alleges that members of the department made Plaintiff's Korean accent the "butt of mockery and jocular treatment" and that this was "humiliating and embarrassing" to Plaintiff. Pl.'s Mem. Br. Supp. Resp. Opp'n to Defs.' MSJ [118] at 32. As support for this allegation, Plaintiff cites his own deposition testimony that Dr. J. Patrick Donohoe and other faculty in the department made "a gesture" with regard to Plaintiff's accent when they talked to Plaintiff, and that if members did not "want to answer [Plaintiff], then [they would] just gesture, 'What, what, what,' something like that." Pl.'s Dep. [117-1] at 129. Plaintiff further testifies:

> A. Actually, when I was—that is all 2002, 2003. At that time, I
> used to have the Korean accent, and then—but, you know, the—

Q. I'm only laughing, because I want to tell you, you still have an accent.

A. Oh, is that right?

Q. Yeah.

*Id.* at 128.

Plaintiff also cites as direct evidence his allegation that Dr. James C. Harden, Plaintiff's former department head and a reviewer of his tenure application, commented to Dr. Georgios Y. Lazarou, "another minority member [of the department]," during a conversation concerning his ability and/or willingness to work with others in his department, that Lazarou might have character issues because of his background. Pl.'s Mem. Br. Supp. Resp. Opp'n to Defs.' MSJ [118] at 33. The Court finds that Plaintiff's arguments are not persuasive; neither any alleged mocking of his accent in 2002 or 2003, nor a comment made by the department head to another member of the faculty about that member of the faculty, constitute direct evidence of discrimination. The Fifth Circuit has indicated that "in order for comments in the workplace to provide sufficient evidence of discrimination, they must be '1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue.' " *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996). As Defendants argue, Plaintiff has not shown that the alleged comments were made in the context of the tenure and promotion process. It is undisputed that such comments and mocking gestures, if made at all, were made prior to Plaintiff's submission of his application for tenure. Specifically, the alleged mocking gestures were made in 2002 or 2003, at least three years before Plaintiff submitted his application for tenure. As such, the gestures were not proximate in time to the tenure denial and termination. The alleged comments and mocking gestures also were not

9

made by an individual with authority over the employment decision, as any faculty members only could have formed a part of the board reviewing the tenure application and the department head was but one reviewer in the multi-tiered tenure review process; thus, neither faculty members nor the department head participated in the ultimate decision to deny Plaintiff tenure. *See Krystek v. Univ. of So. Miss.*, 164 F.3d 251, 256 (5th Cir. 1999). The alleged gestures do not clearly relate to Plaintiff's national origin, and Plaintiff has not shown how the alleged comment made about Dr. Lazarou relates to this Plaintiff, indicates that Dr. Harden sought to enforce a different standard for faculty members of non-American origin, or that such a policy was ever in place at MSU. Overall, the gestures and comment are at best characterized as stray remarks in the workplace, and as such, do not constitute direct evidence of discrimination. *See Brown*, 82 F.3d at 655.

### 2. McDonnell Douglas Framework

### a. Prima Facie Case of Discrimination

To establish that a denial of tenure amounts to discrimination, "[t]he plaintiff must show that: (1) he belongs to a protected group, (2) he was qualified for tenure, and (3) he was denied tenure in circumstances permitting an inference of discrimination." *Krystek*, 164 F.3d at 257 (quoting *Tanik*, 116 F.3d at 775). "To prove a prima facie case, a plaintiff may be able to show 'departures from procedural regularity', 'conventional evidence of bias on the part of individuals involved', or that the plaintiff is found to be qualified for tenure by 'some significant portion of the departmental faculty, referrants[,] or other scholars in the particular field'." *Tanik*, 116 F.3d at 776 (quoting *Zahorik*, 729 F.3d at 93–94).

Neither party disputes that Plaintiff was in a protected group or that he was denied tenure. However, Defendants contend that Plaintiff was not qualified for tenure, and that Plaintiff has

failed to show that he was denied tenure in circumstances permitting an inference of discrimination.

Plaintiff maintains that he met all the qualifications for tenure, had favorable annual reviews, favorable external evaluations, and favorable endorsements, but despite this, was denied tenure in circumstances permitting an inference of discrimination. A faculty member is qualified for tenure at MSU if he or she is (1) hired into a tenure-track faculty position; (2) satisfies a years of service requirement; (3) demonstrates satisfactory performance in teaching, research, and service, and excellence in at least one area; and (4) submits an application for tenure and promotion. MSU Policies & Procedures [111-1] at 3. The parties agree that Plaintiff was hired into a tenure-track faculty position, satisfied his years of service requirement, and demonstrated satisfactory performance in teaching and service. However, the parties dispute whether Plaintiff demonstrated satisfactory performance in research, and excellence in at least one area of review.

Defendants contend that to demonstrate excellence in research a tenure applicant must show that his or her research program is developing a national reputation and that Plaintiff failed to do this. In making this determination, Defendants maintain that reviewers considered the number and nature of Plaintiff's scholarly publications and the amount and type of competitive funding Plaintiff had received from external sources. Defendants contend that at the time of his tenure application, Plaintiff had "struggled to create a sponsored research program," had only three funded research proposals totaling just over $25,000, that only one of those proposals involved external funding, and that Plaintiff's "overall publication record [was] weak," given that he had not published a journal article until 2006, approximately five years after he was hired. Defs.' Mem. Br. Supp. MSJ [112] at 11–16; *see also* ECE Promotion & Tenure Committee, Mem. to Dr. Donohoe [111-6] at 2–3.

11

Plaintiff maintains that the decision to deny him tenure was tainted by discriminatory bias, and argues in support that he was treated less favorably than other similarly situated tenure-track faculty members. To meet the similarly situated standard, a plaintiff "must demonstrate that the misconduct for which she was discharged was nearly identical to that engaged in by an employee not within her protected class whom the company retained." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001) (citations omitted). The "nearly identical" standard is met when "the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. And, critically, the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259–60 (5th Cir. 2009).

Plaintiff argues that he was denied tenure despite being at least equal in qualifications to several Caucasian faculty members who were granted tenure and promoted.[6] Plaintiff focuses on a comparison between his qualifications and the qualifications of Dr. J. W. Bruce, one of the Caucasian faculty members named by Plaintiff.

Plaintiff contends that Dr. Bruce "was tenured and promoted while [Plaintiff] was not[,] even though [Plaintiff] was <u>clearly more qualified</u> than Dr. Bruce." Pl.'s Mem. Br. Supp. Resp. Opp'n to Defs.' MSJ [118] at 6 (emphasis in original). However, the Court finds no factual

---

[6] Plaintiff contends that he was treated less favorably than the following faculty members: Dr. J. W. Bruce, Dr. Lori Bruce, Dr. Reese, Dr. Follet, Dr. Donohoe, Dr. Moorhead, Dr. Bryant Jones, and Dr. King. His arguments with respect to Dr. J. W. Bruce are detailed in the text *supra*. His sole argument with respect to Dr. Lori Bruce is that she and her husband, Dr. J. W. Bruce, created a substantial conflict of interest. Plaintiff also argues that Dr. Reese and Dr. Moorhead were granted tenure even though they had no published journal articles and had lesser qualifications than Plaintiff. Finally, Plaintiff argues that his qualifications exceeded those of Dr. Bryant Jones, who Plaintiff claims had a deficient research record. The Court finds little to no competent evidence in the record to support these conclusory allegations and therefore does not consider them in its analysis. A plaintiff's generalized statements about his qualifications or treatment of similarly situated employees is insufficient to defeat summary judgment. *See Ross v. Univ. of Tex. at San Antonio*, 139 F.3d 521, 526–27 (5th Cir. 1998).

12

support for these contentions. The record does not support Plaintiff's allegation that Dr. Bruce's qualifications did not measure up to Plaintiff's qualifications.

Dr. Bruce was hired in August of 2000 as an assistant professor in MSU's Department of Electrical and Computer Engineering; Plaintiff was hired in August of 2001 as an assistant professor in MSU's Department of Electrical and Computer Engineering. *See* Pl.'s Tenure Appl. [111-5] at 4; Bruce's Tenure Appl. [111-4] at 2. But an examination into the qualifications of the two reveals little similarities in the three areas of performance reviewed in the tenure application process.

Although both Dr. Bruce and Plaintiff scored above-average for the department in teaching evaluations, Dr. Bruce was the first assistant professor recipient of the Bagley College of Engineering Outstanding Engineering Educator award, and Plaintiff had not received a comparative award. *See* Bruce's Tenure Appl. [111-4] at 14. Second, Bruce had eight peer-reviewed, refereed journal publications (many of which were published in Institute of Electrical and Electronics Engineers journals, which the tenure reviewers considered well regarded in the field) after he was hired as an assistant professor at MSU. *See id.* at 9. In contrast, Plaintiff first published a journal article in 2006, approximately five years after he was hired as an assistant professor at MSU. At the time of his tenure application, Plaintiff had three peer-reviewed journal publications in print and several articles that had recently been provisionally accepted for publication. *See* Pl.'s Tenure Appl. [111-5] at 7–8, 17–18.

Third, with respect to research projects and funding, Dr. Bruce represented on his tenure application that he was involved in obtaining nearly $500,000 in external funding. Bruce's Tenure Appl. [111-4] at 9–11. Plaintiff represented in his tenure application that he had earned

13

$26,000 in total funding, $15,000 of which was from external sources. Pl.'s Tenure Appl. [111-5] at 9–10.

Finally, with respect to service, Dr. Bruce served as a national and sectional officer for the American Society for Engineering Education and as associate editor for the publication *IEEE Potentials*, whereas Plaintiff does not indicate on his application that he had any comparable service positions.[7]

Overall, the Court finds that Plaintiff has not shown that he was denied tenure in circumstances permitting an inference of discrimination. However, the Court recognizes that the Fifth Circuit has stated that the plaintiff "need only make a very minimal showing" to establish a prima facie case. *See Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996). Because this Court is viewing this case at the summary judgment stage, it must view the evidence in the light most favorable to Plaintiff. Assuming, *arguendo*, that Plaintiff has established a prima facie case of discrimination, the Court will move to the next step in the analysis.

### b. Legitimate, Nondiscriminatory Reason for Denial of Tenure

Assuming, *arguendo*, that Plaintiff has established a prima facie case of discrimination, this Court will next examine the second step of the burden-shifting analysis: whether Defendants have expressed a legitimate, nondiscriminatory reason for denying tenure. At this step of the analysis, Defendants have the burden of production, not persuasion. *See Burdine*, 450 U.S. at 254, 101 S. Ct. 1089. Defendants state that Plaintiff was denied tenure because he lacked the record necessary to serve as a tenured professor; specifically, Defendants contend that at the time of his tenure application, Plaintiff had only three peer-reviewed published journal articles, had

---

[7] Plaintiff also argues with respect to Dr. Bruce that due to factions within the department Dr. Bruce was given more research opportunities than Plaintiff, and that Plaintiff was shut out from participating with a research team. The Court addresses this line of arguments in the pretext/mixed motives section in the text *infra*.

earned only $26,000 in research funding, and that only one of his grants over a five-year period was from an external source. *See* Defs.' MSJ [111] ¶¶ 33–34.[8]

With respect to the published articles, Defendants maintain that Plaintiff's production in journal publications and funded research was not consistent with successful tenure and promotion. Defendants contend that Plaintiff's three peer-reviewed articles were published in the fall he applied for tenure and promotion, and thus, that Plaintiff had no refereed publications for the first five years he was employed at MSU, suggesting that Plaintiff's publication record was only in the beginning stages. Defendants further cite concern with Plaintiff's lack of research funding compared with his peers. *See* Dep't Recommendation [111-6] at 2–3; Dep't Head Recommendation [111-7] at 3; College Committee Recommendation [111-8] at 2–3; Dean Recommendation [111-9] at 2; Provost Recommendation [111-10] at 2; President Decision [111-11] at 2.

The Court finds that Defendants' proffered reasons for denying Plaintiff's application for tenure and promotion are clear and specific, and thus, that Defendants have met their burden of production and have rebutted the presumption of discrimination. Thus, the burden would next shift back to Plaintiff to show pretext or mixed motives.

### c. Pretext or Mixed Motives

Again, assuming, *arguendo*, that Plaintiff has made a prima facie case and Defendants have sufficiently rebutted this presumption by offering legitimate, nondiscriminatory reasons for the decision to deny tenure, the Court must next examine whether Plaintiff has presented sufficient evidence to create a genuine dispute of material fact that Defendants' proffered reason

---

[8] Defendants present the affidavit of Peter W. Rabideau, Ph.D., the provost of MSU at the time of the alleged incidents, stating that a professor's record of publishing scholarly works and attracting outside research funding are the primary factor for consideration in the research prong of the review. *See* Rabideau Aff. [111-2] ¶ 6.

is merely a pretext for discrimination (the pretext alternative), or that Defendants' reason, while true, is only one of the reasons for the decision, and another motivating factor is Plaintiff's national origin (the mixed-motives alternative). *See Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011). After a close examination of all the arguments and evidence, the Court finds that Plaintiff has failed to present sufficient evidence to rebut Defendants' proffered reasons for the denial of tenure at the summary judgment stage either in the pretext or mixed motives context.

<u>Pretext</u>

"An employer's explanation is false or unworthy of credence if it is not the real reason for the employment action." *Burrell*, 482 F.3d at 412 (citing *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)). In order to raise a genuine dispute of material fact with respect to pretext, the nonmovant must come forward with specific facts; "[c]onclus[ory] allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002). "Evidence that the proffered reason is unworthy of credence must be enough to support a reasonable inference that the proffered reason is false; a mere shadow of doubt is insufficient." *Daniel v. Universal ENSCO, Inc.*, 507 F. App'x 434, 439 (5th Cir. 2013) (per curiam) (quoting *Bauer v. Albemarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999) (in turn quoting *E.E.O.C. v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1443–44 (5th Cir. 1995) (internal quotation marks omitted))).

Plaintiff has presented little to no competent evidence that MSU's decision to deny him tenure was pretext for discrimination. The Court addresses each of Plaintiff's arguments in support of pretext, which appear to be as follows: (1) MSU failed to follow its anti-

16

discriminatory policies with respect to the tenure decision; (2) Plaintiff was the victim of departmental favoritism, which amounts to discrimination; and (3) Plaintiff was denied tenure even though he had favorable annual reviews that indicated he was making adequate progress toward tenure.

First, Plaintiff argues that MSU failed to apply its own anti-discrimination tenure policies when it made the tenure decision, and that this amounts to strong evidence of discriminatory conduct. As support for this claim, Plaintiff argues that Defendants failed to conduct an investigation into his allegations of discrimination, and that Defendants otherwise failed to apply MSU's own anti-discriminatory policies when reviewing his tenure application.

Plaintiff repeatedly argues that no investigation was ever conducted concerning the alleged discrimination, and that this was in violation of MSU's articulated non-discrimination and anti-harassment policy, which calls for an investigation into any allegations of discrimination. Defendants maintain that an investigation was performed by the nine-member University Committee on Promotion and Tenure that included interviews with Plaintiff, the department head, the college dean, and others, and that MSU determined from the investigation that there was no discriminatory basis for Plaintiff's appeal. *See* Defs.' Mem. Br. Supp. MSJ [112] at 15 (citing Greenwood Aff. [111-15] ¶ 7). The Court finds Plaintiff's argument unavailing, as Plaintiff has presented no evidence to support that no investigation was performed, aside from conclusory allegations, which do not satisfy the summary judgment standard for pretext.

Plaintiff additionally argues that MSU improperly selected the external reviewers who submitted commentary on his application "from universities that have different and much more stringent, rigid criteria than [MSU]" and that the result was that "Plaintiff [was] discriminatorily

disfavored." Pl.'s Mem. Br. Supp. Resp. Opp'n to Defs.' MSJ [118] at 7–8. Defendants maintain that Plaintiff selected three of the five external reviewers who ultimately submitted commentary on his tenure application. MSU's policies and procedures support Defendants' argument that it acted appropriately in selecting some external reviewers from other universities. The relevant policies and procedures provide in pertinent part:

> External letters will be solicited from professionals in the field who can provide an impartial evaluation of the candidate's work and accomplishments. The external reviewers will generally be tenured professors at MSU peer institutions, or more prestigious institutions, and should not include individuals who are in a conflict of interest with the candidate.

MSU Policies & Procedures [111-1] § 9.1.2. Defendants maintain that among the reviewers of Plaintiff's tenure application were minorities and persons of different national origins, and that the decision to deny Plaintiff tenure was based on Plaintiff's deficient research record. Plaintiff has not presented evidence that MSU selected external reviewers that would discriminate against Plaintiff, nor has he presented evidence that MSU selected external reviewers who were in a conflict of interest with Plaintiff.

Plaintiff further argues that he was "intentionally set up [to be] harmed and receive negative evaluations." Pl.'s Mem. Br. Supp. Resp. Opp'n to Defs.' MSJ [118] at 9. Plaintiff maintains that his work teaching graduate students should have been counted as research. As earlier stated, Defendants have presented evidence that teaching and research were two separate criteria in the tenure review process, *see generally* MSU Policies & Procedures [111-1], and that a professor's record of publishing scholarly works and attracting outside research funding are the primary factors for consideration in the research prong of the review, *see, e.g.*, Rabideau Aff. [111-2] ¶ 6. Plaintiff presents no evidence to support his contentions aside from his own subjective beliefs.

18

Defendants contend that MSU follows the same procedure with all tenure applicants regardless of race or national origin, and as support for this, cites the fact that subsequent to the denial of Plaintiff's tenure application, other faculty members of MSU, Dr. Jenny Du, an Asian female, and Dr. Yaroslav Koshka, a native of Ukraine and native Russian speaker, applied for and were granted tenure and promotion after being evaluated by the same committees that evaluated Plaintiff. *See* Defs.' Mem. Br. Supp. MSJ [112] at 17. Defendants further contend that another faculty member of MSU, Dr. Erdem Topsakal, a male of foreign national origin, submitted an application for early tenure and promotion, and that MSU granted him an early promotion to associate professor in 2006 and tenure in 2007. *See* Pl.'s Dep. [111-37] at 117, 121–22 (acknowledging that these individuals were granted tenure and promotion).

The Court finds that Plaintiff has produced little to no evidence that Defendants applied any other policy or practice with respect to Plaintiff than it would with any other tenure applicant. What evidence has been presented tends to show that the review of Plaintiff's tenure application was an exercise of professional judgment, not of discriminatory intent. Thus, the Court finds that this argument does not support that Defendants' denial of his tenure application was pretext for discrimination.

Second, Plaintiff makes several allegations that Defendants disfavored Plaintiff. Plaintiff alleges that "Defendants chose not to provide [Plaintiff] funding, support, and contacts that American[-]born professors were provided" and that the result was that "[Plaintiff's] work was discriminatorily impacted by this lack of support." Pl.'s Mem. Br. Supp. Resp. Opp'n to Defs.' MSJ [118] at 2. Plaintiff further argues that he was not provided equal opportunity for attending projects in the computer-engineering group, was directed to start a new program from scratch, and was isolated and not helped.

19

Plaintiff presents no evidence to support these allegations other than Plaintiff's own conclusory statements and subjective beliefs. Plaintiff has also failed to present sufficient evidence to connect these allegations to any alleged discrimination. To this Court, Plaintiff's allegations strongly suggest that if favoritism existed in the department, it was due to differing ideas on the research function—not due to race or national origin. Therefore, the Court finds that Plaintiff has failed to show how these allegations constitute evidence of pretext, and further has failed to show how any alleged favored treatment in the department was motivated by any discriminatory animus.

Third, Plaintiff argues that his annual reviews verified his credentials and supported that "his accomplishments were clearly superior to those of American professors who were tenured and promoted," and thus, that the decision to deny him tenure was based on discriminatory animus. *Id.* The Court has carefully reviewed all annual reviews and other documentation submitted in this respect and finds that it was consistently noted in Plaintiff's annual reviews during his probationary years that his research funding and publication record was deficient and that Plaintiff should focus on publishing and improving in this area. *See, e.g.,* 2001 Annual Faculty Review [111-28] at 5 ("As [Plaintiff] develops his research program, a priority should be given to publications, especially in peer reviewed journals."); 2002 Annual Faculty Review [111-29] at 8 ("We encourage [Plaintiff] to evaluate and expand his research options and acknowledge his exploration of possible links to network processor research. . . . [Plaintiff's] production in publications and submissions of publications needs improvement.") & 9 ("Please emphasize research and journal papers."); 2003 Annual Faculty Review [111-30] at 10 ("Submitting refereed papers is good, but successful publishing is needed. Continue emphasis on research and publications. In order to gain tenure, you will need to increase productivity."); 2004 Annual

20

Faculty Review [111-31] at 1 ("[Plaintiff] will need to be more aggressive in submitting proposals to multiple funding agencies in order to build a funding base for his research program.") & 11 ("Progress Toward Tenure and Promotion: Unsatisfactory. The level of publishing in refereed journals and conferences, and involvement in research is not consistent with requirements for tenure or promotion. [Plaintiff] will need to achieve a very strong reversal of the current production levels in these areas to be in position to obtain tenure and promotion."); 2005 Annual Faculty Review [111-32] at 11 ("Proposal submission activity did not reach 2005 goals.") & 13 ("Progress Toward Tenure and Promotion: Improving, but must show significant scholarly results before going up for tenure and promotion in the fall. . . . [Plaintiff's] proposal output and research funding level continue to fall short of requirements consistent with requirements for tenure or promotion. [Plaintiff] will need to continue [to] make adjustments and increase the current production levels in these areas to be in position to be considered favorably for tenure and promotion."); 2006 Annual Faculty Review [111-33] at 13 ("[Plaintiff's] research funding is unsatisfactory. . . . [I]t is not clear that [Plaintiff] will be successful in funding his research program on a long[-]term basis. . . . Progress toward Tenure and Promotion: Some improvement, but still unsatisfactory. . . . [Plaintiff's] proposal output and research funding level continue to fall short of requirements consistent with tenure or promotion."). In addition, the evidence supports that Plaintiff had a third-year review process during which time he was informed that his progress in the area of research was unsatisfactory. Third-Year Review Letter [111-35] at 3–4. Thus, Plaintiff was made aware during the tenure probationary period that his research program was not sufficient to meet the requirements for tenure.

Overall, the Court finds no evidence that Plaintiff's colleagues did not face similar pressures in their efforts to attain tenured positions, nor is there any evidence that, having failed to meet this requirement, Caucasian assistant professors were nonetheless granted tenure. Although Plaintiff's version of the facts differs in some respects from Defendants' version of the facts, it takes more than that to create a genuine dispute of fact with respect to pretext. *See LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007) ("simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext"). The "existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification." *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991) (internal citation omitted).

Thus, Plaintiff has presented little, if any, "competent evidence that the presumptively valid reasons for [the denial of tenure] were in fact a coverup for a . . . discriminatory decision." *See McDonnell Douglas*, 411 U.S. at 805, 93 S. Ct. 1817. Accordingly, the Court concludes that Plaintiff's evidence is insufficient to raise a genuine dispute of material fact as to whether Defendants' proffered reasons for their actions were pretext for unlawful discrimination.

<u>Mixed Motives</u>

Lastly, the Court considers whether Plaintiff has raised a genuine dispute of material fact that, while Defendants' proffered rationale for its employment decision is true, the proffered rationale is only one reason for its decision, and another motivating factor for the decision was Plaintiff's race or national origin. The Court finds that Plaintiff has failed to show that Defendants intentionally discriminated against him, and thus, his case fails even if considered in the mixed motives context.

### D. Conclusion

In sum, the Court finds that Plaintiff has presented insufficient evidence that unlawful discrimination played any role in MSU's decision to deny Plaintiff tenure; that MSU presented legitimate, nondiscriminatory reasons for the denial of tenure; and that Plaintiff has not met his burden with respect to pretext or mixed motives. Accordingly, Defendants' motion for summary judgment **[111]** is **GRANTED**; Defendants' motion *in limine* **[121]** is **DENIED AS MOOT**; and Plaintiff's case is **DISMISSED WITH PREJUDICE**.

A separate order in accordance with this opinion shall issue this day.

THIS, the *31st* day of January, 2014.

_Glen H. Davidson_
SENIOR JUDGE